United States District Court

For the Northern District of California

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   SARA G. MAURER,                          No. C 08-04109 MMC

11              Plaintiff,                     **ORDER DENYING PLAINTIFF'S MOTION
                                               FOR JUDGMENT; GRANTING
12       v.                                    DEFENDANT'S MOTION FOR
                                               JUDGMENT**
13   RELIANCE STANDARD LIFE INSURANCE
     COMPANY; THE LAW OFFICES OF SARA
14   G. MAURER LONG TERM DISABILITY
     PLAN,
15
              Defendants
16   _____/

17

18       Before the Court are cross-motions for judgment, filed, respectively, by plaintiff Sara

19   Maurer ("Maurer") and defendants The Law Offices of Sara G. Maurer Long Term Disability

20   Plan and Reliance Standard Life Insurance Company (collectively, "RSL"), each brought

21   pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Having read and considered

22   the parties' respective submissions in support of and in opposition to the cross-motions,[1]

23   the Court rules as follows.[2]

24   _____

25       [1] After the parties filed their respective replies, Maurer filed, on November 16, 2009,
     "Proposed Findings of Fact and Conclusions of Law in Opposition to Defendants' Cross-
26   Motion for Judgment and in Support of Plaintiff's Motion for Judgment Under Rule 52,
     FRCP," and, on December 4, 2009, April 5, 2010, and March 9, 2011 respectively, three
27   "Statement[s] of Recent Decision."  RSL objects to each filing as untimely.  RSL's
     objections are hereby overruled.
28
         [2] On November 17, 2009, the Court took the matter under submission and vacated
     the hearing scheduled for November 20, 2009.

## BACKGROUND

Maurer seeks relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., claiming RSL abused its discretion when it terminated Maurer's disability benefits.  She seeks damages pursuant to 29 U.S.C. § 1132(a)(1)(B), and equitable relief pursuant to 29 U.S.C. § 1132(a)(3).

**I.  The Disability Policy**

In 1996, the Law Offices of Sara G. Maurer purchased a group disability policy ("the Plan") issued by RSL.  (See MAU00163.)[3]  Maurer, an attorney, was covered by the Plan at all relevant times.  The Plan provides benefits for policy-holders who become "totally disabled," defined as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1) during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and
>
> (2) for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
> > (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
>
> (3) after a Monthly benefit has been paid for 36 months, an Insured cannot perform each and every material duty of any occupation.  Any occupation is one that the Insured's education, training or experience will reasonably allow.

(MAU00168.)

Additionally, the Plan includes the following limitation with respect to benefits, commonly referred to as the "Mental/Nervous Limitation":

> Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders . . . will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months . . . .

---

[3] Unless otherwise noted, citations herein are to the record attached as Exhibit A to the Declaration of Horace W. Green, filed October 9, 2009.

. . .

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:

(1) bipolar disorder (manic depressive syndrome);
(2) schizophrenia;
(3) delusional (paranoid) disorders;
(4) psychotic disorders;
(5) depressive disorders;
(6) anxiety disorders;
(7) somataform disorders (psychosomatic illness);
(8) eating disorders; or
(9) mental illness.

(MAU00178.)

## II. Maurer's Disability Claim

Maurer filed a disability claim on December 30, 2002, stating she was unable to work as of October 23, 2002.  (See MAU00156-57.)  In her claim she cited "intense pain," arising from "cumulative" injuries, as the reason she was unable to work.  Id.  She ceased working based on the advice of her primary physician, Robert Hines, M.D. ("Dr. Hines"), a board-certified psychiatrist specializing in pain disorders, who had been treating Maurer since 2001.  (See MAU00599, MAU00643, MAU00886.)  At the time she stopped working, Maurer suffered from "chronic pain," as well as "bloating," "constipat[ion]," and "drench[ing] sweats."  (See MAU0589.)

Maurer has a history of various injuries and maladies dating back to 1988, when she was involved in a skiing accident in which she suffered severe back trauma.  (MAU00722.)  In particular, she has "a past history of anemia" and "depression probably related to the illness," "psoriasis," "severe liver disease associated with the HELP syndrome," "[g]eneralized fibromyalgia," and "pre-eclampsia and then eclampsia," including "a diffuse bleed into all of her organs two days after the eclampsia and the delivery of her baby" that led to a "belie[f] that she would certainly die," but that she and her child survived.  (See MAU00722, MAU00725.)  She has been prescribed numerous medications to address the various physical and mental components of her disorders, and at the time she filed for disability benefits, she was taking Effexor, Wellbutrin, Zanaflex, Valium, Ambien,

3

1    Trazodone, Ketamine, Litoderm, and Protonix.  (See MAU00638.)  Maurer has been living

2    with chronic pain since roughly 1998.  (See MAU00127.)

3         As noted above, Maurer, in 2002, ceased her work as an attorney and filed for

4    disability benefits on account of chronic neck and back pain.  (See MAU00155.)  She

5    submitted her medical records to RSL, including extensive notes from her visits with Dr.

6    Hines, as well as notes from another physician, James Gardner, M.D. ("Dr. Gardner"), who

7    specialized in internal medicine (see, e.g., MAU00571-90, MAU00593-602).  On June 26,

8    2003, after a review of the file by MaryAnn Lubrecht, R.N., who found support therein for

9    fibromyalgia, with a "significant psych component to chronic pain," (see MAU00570),

10   Maurer's claim was approved and RSL began paying her disability benefits, including

11   payments covering the period after December 22, 2002 (see MAU00123).

12        In March 2004, RSL requested updated medical information from Dr. Hines.  (See

13   MAU00507.)  Dr. Hines's records contained numerous references to Maurer's stress,

14   anxiety, and depression, and included diagnoses of "bipolar diathesis", "Mood Disorder with

15   Generalized Medical Condition;" "Generalized Anxiety Disorder;" and "Pain Disorder with

16   Mixed Physical and Psychological features."  (See, e.g., MAU00508, MAU00510,

17   MAU00518, MAU00520, MAU00526-27, MAU00528, MAU00530, MAU00560, MAU00634.)

18   Additionally, in Dr. Hines's opinion, Maurer's ability to mange her pain was adversely

19   affected by "intercurrent stressors," including personal and family problems.  (See

20   MAU00642, MAU00648.)  Based on Dr. Hines's updated records, RSL determined

21   Maurer's claim warranted reevaluation.  (See MAU00490.)  Barbara Finnegan, R.N., a

22   nurse consulting with RSL, suggested Maurer's file be evaluated by William Scott

23   Hauptman, M.D. ("Dr. Hauptman"), a board-certified specialist in internal medicine and

24   gastroenterology, in order to determine if the Mental/Nervous Limitation was applicable.

25   (See id., MAU00478.)  In September 2004, Dr. Hauptman reviewed Maurer's file and

26   determined that "without the contribution of mental nervous illness, current medical records

27   are consistent with the ability for full time sedentary work."  (See MAU00486.)

28        In 2005, RSL requested and received further updates from Dr. Hines.  (See

4

MAU01004.)  Dr. Hines submitted an RSL "Attending Physician's Statement," which included his diagnosis that Maurer was suffering from a "mood disorder as a result of" her "severe multi-level [degenerative disc disease]" and resultant "chronic pain." (See MAU1006.)  RSL thereafter directed Maurer to undergo an independent medical evaluation ("IME") for the purpose of determining whether "[w]ithout the contribution of mental nervous would [Maurer] be capable of work activity."  (See MAU01002.)  In October, 2005, Maurer met with Leslie Schofferman, M.D. ("Dr. Schofferman") a "Diplomate" of the American Board of Internal Medicine and the American Board of Pain Medicine, as well as a state-appointed Quality Medical Evaluator, who conducted the IME (See MAU00974-82.) Dr. Schofferman ultimately concurred with Dr. Hauptman's assessment, finding that " without the psychiatric elements, [Maurer] would be capable of work activity."  (See MAU00981.)

In June, 2006, Maurer received word from the Social Security Administration ("SSA") that her claim for Social Security disability benefits was denied.  (See MAU00217).  The SSA determined that, although Maurer was experiencing "discomfort," the medical records showed she was "able to walk and move about" such that she was able to satisfactorily perform the duties of an attorney. (See MAU00218.)  RSL received a copy of the SSA's report and requested updated medical information from Maurer.  (See MAU00040, MAU00038.)  RSL thereafter conducted another medical review, by I. Bergstorm, R.N., in which it found no change in Maurer's condition since the time of her IME with Dr. Schofferman.  (See MAU00893.)

On November 3, 2006, RSL sent Maurer a letter, notifying her that it was terminating her benefits (see MAU00017-19).  In the letter, RSL noted the Plan's requirement that, in order to continue to receive benefits after 36 months, an insured must be incapable of performing "each and every material duty of any occupation," which provision, RSL explained, was applicable to Maurer as of December 22, 2005; RSL further stated: "[Y]our physical limitations do not prevent a return to work in your normal occupation." (See MAU00017.)  Additionally, RSL noted that any psychiatric condition preventing such a

1   return "would be subject to the maximum duration of 24 months."  (See MAU00018.)[4]

2       Maurer objected to RSL's decision, contending RSL's determination as to the

3   Maurer's ability to return to work was incorrect.  (See MAU00015-16.)  Dr. Hines submitted

4   a letter on behalf of Maurer, stating that the "resultant emotional and social difficulties that

5   have ensued from the patient's chronic pain and limitations," which he had described in his

6   notes, were "not the fundamental basis of [Maurer's] disability."  (See MAU00885.)  RSL

7   thereafter referred Maurer's claim to a pain management specialist, Suresh Mahawar, M.D.

8   ("Dr. Mahawar").  (See MAU00873-81.)  RSL made another payment of disability benefits

9   to Maurer while her objection was pending.  (See MAU00001.)

10       Dr. Mahawar, who is board-certified in pain management, conducted a peer review

11   of Maurer's medical records, and concluded Maurer was not physically totally disabled.[5]

12   (See MAU00877.)  Dr. Mahawar expressly disagreed with Dr. Hines's "recommendation for

13   her total inability to work."  (See MAU00876.)  RSL interpreted Dr. Mahawar's report as a

14   determination that Maurer was physically capable of performing sedentary work.  (See

15   MAU00869.)  On March 5, 2007, RSL claims examiner Joan McErlane ("McErlane")

16   advised Maurer that she no longer was eligible for benefits.  (See MAU00741.)  McErlane

17   also informed Maurer of her right to appeal the denial.  (See id.)

18       In April 2007, Maurer filed an appeal, with which she submitted her medical records

19   from a board-certified rheumatologist, Joan Campagna, M.D. ("Dr. Campagna").  (See

20   MAU00728, MAU00721-26.)  Dr. Campagna's report included diagnoses of psoriatic

21   arthritis, sciatica, generalized fibromyalgia, and gastroesophageal reflux disease ("GERD"),

22   and noted evidence of spondylitis.  (See MAU00725-26.)  According to Dr. Campagna,

23   Maurer was "completely disabled from psoriatic arthritis."  (See MAU00691.)

24

25       [4]  As discussed above, RSL began paying Maurer disability benefits for the period
     after December 22, 2002, more than 24 months prior to the November 3, 2006 termination

26   of Maurer's benefits

27       [5]  Additionally, Dr. Mahawar found Maurer was not suffering from a "significant
     psychiatric impairment.  (See MAU00877.)  Dr. Mahawar noted, however, that he was "not

28   an expert" in the field of psychiatry, and that "a qualified psychologist or psychiatrist could
     render a final opinion in this regard."  (See id.)

1    After receiving Dr. Campagna's assessment, RSL arranged a second IME.

2  (See MAU00685.)  Maurer was evaluated by Neal S. Birnbaum, M.D. ("Dr. Birnbaum"), a

3  board-certified rheumatologist and "Fellow" of the American College of Physicians, who

4  performed a physical examination of Maurer (see MAU00781) and reported that he "could

5  not confirm [Dr. Campagna's] diagnoses based upon the available records and [his] own

6  examination" (see MAU00782).  Dr. Birnbaum further reported that he "did not find purely

7  physical reasons for [Maurer's] claim of disabling pain," explaining that "[t]here clearly is a

8  significant element of psychiatric dysfunction in terms of both anxiety and depression."

9  (See MAU00782.)  In Dr. Birnbaum's opinion, Maurer's "symptoms are primarily related to

10  chronic pain and psychiatric dysfunction rather than inflammatory disease." (See

11  MAU00783.)

12    RSL's appeals department then referred Maurer's file for a vocational assessment.

13  (See MAU00772.)  The reviewing specialist determined Maurer was physically capable of

14  performing a variety of occupations, including attorney, adjudicator, contract clerk, legal

15  investigator, and consultant.  (See MAU00769.)

16    On November 5, 2007, a year after her benefits were initially terminated, RSL

17  notified Maurer by letter that her appeal was denied (see MAU00660), and that the denial

18  was final and unappealable (see MAU00669).  The letter, which comprised eleven pages,

19  outlined in detail the reasons for the denial of Maurer's claim, and set out RSL's conclusion

20  that "in the absence of [Maurer's] significant psychiatric component, [her] physical status

21  would not preclude work function" and that RSL did not have "satisfactory proof of

22  [Maurer's] claimed physical inability to perform some of the material duties of any sedentary

23  occupation."  (See MAU00667, MAU000669 (emphasis in original).)  In reaching that

24  conclusion, RSL relied upon the opinions of Drs. Hauptman, Schofferman, Mahawar, and

25  Birnbaum, and explained why it had not relied on the opinions of Drs. Hines and

26  Campagna.  (See MAU00660-69.)

27                                          **LEGAL STANDARD**

28    The standard of review applicable to a plan administrator's denial of ERISA benefits

1   is dependent upon the terms of the benefit plan.  Firestone Tire & Rubber Co. v. Bruch, 489

2   U.S. 101, 115 (1989).  If "the benefit plan gives the administrator or fiduciary discretionary

3   authority to determine eligibility for benefits or to construe the terms of the plan," an abuse

4   of discretion standard is applied; otherwise, the denial is reviewed de novo.  Id.  Here, the

5   parties agree that the benefit plan provides RSL discretionary authority, and consequently,

6   an abuse of discretion standard is applicable.[6]

7          An "inherent conflict" of interest exists, however, where, as here, "a plan

8   administrator both administers the plan and funds it."  Abatie v. Alta Health & Life Ins. Co.,

9   458 F.3d 955, 967 (9th Cir. 2006).[7]  "[I]f a benefit plan gives discretion to an administrator

10  or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a

11  factor in determining whether there is an abuse of discretion."  Firestone, 489 U.S. at 115

12  (internal quotes omitted).  An inherent, or "structural," conflict, "should prove more

13  important (perhaps of great importance) where circumstances suggest a higher likelihood

14  that it affected the benefits decision, including, but not limited to, cases where an insurance

15  company administrator has a history of biased claims administration," and "should prove

16  less important (perhaps to the vanishing point) where the administrator has taken active

17  steps to reduce potential bias and to promote accuracy, for example, by walling off claims

18  administrators from those interested in firm finances, or by imposing management checks

19  that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."

20  See Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 117 (2008).  As the Ninth

21

22          [6]  The Plan expressly provides that RSL "has the discretionary authority to interpret
23  the Plan and the insurance policy and to determine eligibility of benefits" and that
    "[d]ecisions by [RSL] shall be complete, final and binding on all parties."  (See MAU00171.)

24          [7]  In support of its opposition, RSL submitted an affidavit setting forth RSL's
25  procedures with respect to separation of claims evaluation and payment of benefits
    (see Aff. of Peter Sailor), to which Maurer has filed an objection and motion to strike based
26  in part on RSL's failure to disclose such affiant as a possible witness, pursuant to Rule
    37(c)(1) of the Federal Rules of Civil Procedure.  The objection is sustained and the motion
27  to strike is hereby GRANTED.  RSL's structural conflict was known from the outset of the
    litigation and the relevance of the recently-disclosed evidence to such issue is not
28  dependent on any particular argument made by Maurer in the course of the proceedings
    thereafter.

1    Circuit observed in <u>Abatie</u>:

2            The level of skepticism with which a court views a conflicted administrator's
             decision may be low if a structural conflict of interest is unaccompanied, for
3            example, by any evidence of malice, of self-dealing, or of a parsimonious
             claims-granting history.  A court may weigh a conflict more heavily if, for
4            example, the administrator provides inconsistent reasons for denial; fails
             adequately to investigate a claim or ask the plaintiff for necessary evidence;
5            fails to credit a claimant's reliable evidence; or has repeatedly denied benefits
             to deserving participants by interpreting plan terms incorrectly or by making
6            decisions against the weight of evidence in the record.

7     <u>Abatie</u>, 458 F.3d at 968-69 (internal citations omitted).

8            Here, Maurer contends the Court should apply a high level of skepticism to RSL's

9    decision.[8]  In support thereof, Maurer points primarily to RSL's continued use of Dr.

10   Mahawar and Dr. Hauptman, citing cases in which their impartiality has been questioned.

11   Recently, the Ninth Circuit had occasion to address RSL's use of Dr. Hauptman, <u>see</u> <u>Gunn</u>

12   <u>v. Reliance Standard Life Ins. Co.</u>, 399 F. App'x 147, 154-55 (9th Cir. 2010) (mem.), finding

13   that, "[a]lthough it is appropriate to consider Dr. Hauptman's longstanding relationship with

14   [RSL] in weighing the degree of any conflict of interest attached to his opinion, that

15   relationship alone does not mandate a finding that [RSL] should have completely

16   disregarded his opinion." <u>Id.</u> at 155 (noting "[t]he fact that [RSL] ultimately accepted the

17   opinions of Drs. Orfuss [a neurologist who examined Gunn at RSL's request] and

18   Hauptman in regard to whether Gunn's multiple sclerosis symptoms were sufficient in

19   themselves to result in total disability is not sufficient to show bias").  Here, similarly, RSL's

20   reliance on Drs. Mahawar and Hauptman is, without more, insufficient to support

21   application of the high level of skepticism Maurer contends is appropriate, particularly given

22   RSL's additional reliance on the opinions of Drs. Schofferman and Birnbaum, both of whom

23   personally examined Maurer, as well as on the records provided by Dr. Hines, Maurer's

24   treating physician.

25           Maurer identifies no evidence of "malice" or "self-dealing" by RSL, or of a

26

27           [8]  Maurer requests the Court take judicial notice of three exhibits: a Form 8-K filed by
     Delphi Financial Group (Supp. Decl. of Rebecca Grey, Ex. C), RSL's Annual Statement for
28   2007 (<u>id.</u> at Ex. D), and an article published in the Daily Journal (<u>id.</u> at Ex. E).  No objection
     has been filed.  Accordingly, the request is granted.

1  "parsimonious claims-granting history." See Abatie, 458 F.3d at 968-69. Although Maurer

2  disagrees with RSL's ultimate determination, Maurer has not shown RSL failed to conduct

3  an adequate investigation as to her claim, and, indeed, RSL made an additional payment of

4  disability benefits to Maurer after its initial termination letter. During the course of its

5  investigation, RSL had four specialists review Maurer's claim, each of whom arrived at a

6  determination consistent with that of the others,[9] and it did not arbitrarily ignore contrary

7  medical evidence.

8       In light of the above circumstances and findings, the Court will apply an abuse of

9  discretion review tempered by a moderate degree of skepticism.

10                                    **DISCUSSION**

11      The issue presented by the instant case is whether RSL abused its discretion when

12  it determined Maurer was not entitled to disability benefits after 36 months of such

13  payments. In particular, the Court must determine: (1) whether RSL reasonably interpreted

14  the phrase "mental disorder" as used in the Mental/Nervous Limitation; (2) whether the RSL

15  reasonably interpreted the phrase "caused or contributed to by" as used in the

16  Mental/Nervous Limitation; (3) whether RSL reasonably interpreted the phrase "each and

17  every" as used in the definition of "Total Disability"; and (4) whether, under the policy as

18  properly construed, RSL abused its discretion in finding Maurer was not totally disabled.

19  **I.      Mental/Nervous Limitation**

20       **A.      "Mental Disorder"**

21       As noted, the Mental/Nervous Limitation provides that a disability "caused or

22  _____

23       [9] Maurer argues that RSL engaged in "post-hoc rationales" for its denial of benefits,
    by relying, "for the first time in litigation," on the Social Security Administration's denial of
24  Maurer's claim and by identifying Maurer's ability to engage in sedentary activity. (See
    Reply 2:20-4:13.) RSL does not contend, however, that its decision to terminate Maurer's
25  benefits was based on the Social Security Administration's decision (see Defs.' Cross-Mot.
    at 32:2-6), and, in its final termination letter, RSL expressly cited Maurer's ability to engage
26  in sedentary activity as a reason for the termination of her benefits (see MAU00664).
    Moreover, RSL was consistent in providing its reason for terminating Maurer's benefits,
27  stating in its initial letter of November 2006 its finding that Maurer's physical limitations did
    not preclude her return to her "normal occupation," which was sedentary, and citing in
28  addition the preclusion of continued benefits after 36 months as well as the Mental/Nervous
    Limitation's 24-month cap on benefits. (See MAU00017.)

1  contributed to by" a "mental or nervous disorder" is covered by the Plan for a maximum

2  duration of 24 months.  (See MAU00178.)  Maurer's first argument is that the term "mental

3  disorder" should not be interpreted to include "psychological factors which arise from [or]

4  exacerbate the underlying medical condition," and that RSL abused its discretion by

5  interpreting the Limitation to include such factors.  (See Pl.'s Mot. at 22:17-19.)  In that

6  regard, Maurer argues that the term "mental disorder" is ambiguous.  See Lang v. Long-

7  Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 799 (9th Cir.

8  1997) (holding "mental disorder" presents "almost classic ambiguity" in that "it could

9  reasonably refer either to illnesses with non-physical causes, or to illnesses with physical

10  causes, but exhibiting both physical and non-physical symptoms").  Relying on the doctrine

11  of contra proferentem, Maurer further argues any such ambiguous term must be interpreted

12  against RSL.  See id. (holding, under "doctrine of contra proferentem," ambiguities in

13  insurance contracts "are construed against the insurance company"; adopting interpretation

14  of "mental disorder" advanced by claimant).

15      Although Maurer is correct that the term "mental disorder" is ambiguous, her reliance

16  on the doctrine of contra proferentem is unavailing, as "[t]he rule applies in interpreting

17  ambiguous terms in an ERISA-covered plan except where the plan: (1) grants the

18  administrator discretion to construe its terms, (2) is the result of a collective-bargaining

19  agreement, or (3) is self-funded."  See Blankenship v. Liberty Life Assurance Co. of Boston,

20  486 F.3d 620, 625 (9th Cir. 2007) (emphasis added); see also Lang, 125 F.3d at 799

21  (reviewing denial of benefits de novo where plan's "decision was affected by self-interest";

22  applying contra proferentem but noting: "If we were according Standard's interpretation the

23  deference ordinarily due an administrator vested with discretion to interpret the plan, we

24  would have to uphold Standard's interpretation as reasonable"); Patterson v. Hughes

25  Aircraft Co., 11 F.3d 948, 951 (9th Cir. 1993) (applying contra proferentem in context of de

26

27

28

11

1  novo review).[10]

2      Here, the Plan expressly provides RSL"discretionary authority to interpret the Plan

3  and the insurance policy" (see MAU00171), and, as discussed above, Maurer has not

4  made a showing sufficient to warrant a high degree of skepticism or de novo review.

5  Consequently, the rule of contra proferentem does not apply, and RSL's interpretation of

6  the Plan will govern unless it "conflicts with the plain language of the [P]lan." See Winters

7  v. Costco Wholesale Corp., 49 F.3d 550, 553-54 (9th Cir. 1995) (rejecting application of

8  contra proferentem where plan granted plan fiduciary discretion to interpret; noting court's

9  "inquiry is not into whose interpretation of the plan document is most persuasive, but

10 whether the plan administrator's interpretation is unreasonable" (internal quotation and

11 citation omitted)); see also Glotzer v. Metro. Life Ins. Co., 1 F. App'x 740, 743 (9th Cir.

12 2001) (rejecting application of contra proferentem where "abuse of discretion was the

13 proper standard of review under the terms of the plan, and [plaintiff] presented no evidence

14 of a serious conflict of interest").

15     No such conflict with the language of the Plan has been shown.  In particular, the

16 Plan does not specify that a "mental disorder" must arise independent of a physical

17 disorder.  (See MAU00178.)  Rather, the term is used without any limitation.

18     Accordingly, RSL did not abuse its discretion in interpreting the Limitation to include

19 all mental disorders, whether resulting from, arising independent of, or causing any physical

20 disorder.

21     **B.    "Caused By or Contributed to By"**

22     As noted, the Mental/Nervous Limitation applies to a claimant's "Total Disability

23 caused by or contributed to by mental or nervous disorders."  (See MAU00178.)  Maurer

24 argues that the phrase "caused by or contributed to by" is ambiguous, that such language

25

26      [10]  Although the Patterson court found the plan at issue therein "grant[ed] the plan
27 administrator power to determine eligibility," there is no finding that the plan granted
   discretionary authority to interpret the plan's terms.  See id. at 949, 950; see also Glotzer, 1
28 F. App'x at 743 (describing Patterson as applying "an overall de novo review of the plan
   administrator's decision").

12

1   should be interpreted to apply only to disabilities that result solely from a mental disorder,

2   and that RSL abused its discretion in interpreting the Limitation to cover disabilities

3   resulting from a combination of mental and physical disorders.

4          Contrary to Maurer's argument, the phrase "caused by or contributed to by" is not

5   ambiguous.  By the inclusion of the words "or contributed to by," the Plan clearly states that

6   a mental disorder need not be the sole cause of a total disability for the limitation to apply.

7   See Gunn v. Reliance Standard Life Ins. Co., 592 F. Supp. 2d 1251, 1261 (C.D. Cal. 2008)

8   ("[A]dding the phrase 'or contributed to by' to 'caused by'. . . eliminated as a possible

9   interpretation that the policy limitation applied only when the inability to work is solely the

10  result of [a mental disorder].") overruled on other grounds, 399 F. App'x at 151 (noting

11  defendant's interpretation of "limitation for mental and nervous disorders does not conflict

12  with the [p]lan terms and is reasonable").  As long as a mental disorder is a component of a

13  claimant's overall disability, and a claimant would not be disabled but for the contribution of

14  such mental disorder, the Limitation is applicable.  See Michaels v. Equitable Life Assur.

15  Society, 305 F. App'x 896, 903-04 (3rd Cir. 2009) (holding, where "a disabled claimant

16  suffer[s] from both mental and physical conditions, neither of which [is] independently

17  debilitating under the [p]lan, and the combined effect of those conditions render[s] the

18  claimant totally disabled," claimant not entitled to benefits under plan providing two-year

19  cap for disability "caused to any extent by a mental condition"; distinguishing situation

20  where "physical disability [is] independently sufficient to render [claimant] totally disabled"

21  (emphasis added)).

22         In sum, RSL was not unreasonable in interpreting the Limitation as it did.[11]

23  Accordingly, to be eligible for continued benefits under the Plan, Maurer must show she is

24  disabled solely as a result of a physical disability, without any contribution from any mental

25  disorder from which she may suffer."

26

27         [11]  Moreover, even if the term "caused by or contributed to by" were ambiguous,
    RSL, as discussed above, had the discretion to interpret the Limitation, and RSL's
28  interpretation does not conflict with the plain language thereof

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     "Totally Disabled"/"Total Disability"

Maurer's third contention is that RSL misinterpreted the term "Total Disability" as used in the Plan and thus abused its discretion in finding she was not totally disabled. Under the Plan, after a claimant has received benefits for a period of 36 months, "Total Disability" means the "Insured cannot perform each and every material duty of any occupation." (See MAU00168.)  Maurer reads this provision to mean that a claimant is totally disabled if the claimant can perform some, but not all, material duties of an occupation.  Conversely, RSL interprets the provision to mean that if a claimant can perform even one material duty of an occupation, the claimant is not totally disabled.

In McClure v. Life Ins. Co. of North America, 84 F.3d 1129 (9th Cir. 1996), the Ninth Circuit considered an ERISA plan that required the claimant to be unable to perform "every duty of his occupation."  See id. at 1133.  The Ninth Circuit found the provision to be ambiguous, noting the word "every" is "sometimes equivalent to 'all,' and sometimes equivalent to 'each.'"  See id. at 1134 (emphasis omitted).  Courts that have considered the term "each and every," however, have interpreted such language in the same manner as RSL does here.  See Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 607 (6th Cir. 2003) (interpreting "each and every duty" to mean "[i]f a claimant can perform even one material duty of his regular occupation . . . he is not totally disabled"); Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270, 275 (4th Cir. 2002) (interpreting provision using "each and every"; concluding "[b]ecause [claimant] could perform certain occupational duties . . . [claimant] has not submitted objectively satisfactory evidence that he was unable to perform each and every material duty of his occupation").

Additionally, the language of the Plan, when viewed as a whole, supports RSL's interpretation.  The Plan includes a definition of "partial" disability.  Specifically, for the first 36 months for which benefits are payable, a claimant is considered "partially disabled" if he/she can perform "some of the material duties [of his/her regular occupation] on a full-time basis."  (See MAU00168.)  It follows that a claimant who is able to perform some material duties cannot be "totally disabled," because such claimant is, by definition, partially

14

1    disabled.[12]  See Tippett v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1237 (11th Cir.

2    2006) (holding "if the insured can perform some, but not all, of the duties of his occupation . .

3    . he is partially disabled; therefore, he is not totally disabled within the meaning of the plan").

4

5         In sum, RSL's interpretation of the term "each and every" is reasonable and does not

6    conflict with the plain language of the Plan.  Accordingly, to be eligible for continued benefits

7    under the Plan, Maurer must show she can perform none of the material duties of any

8    occupation commensurate with her education, training or experience.[13]

9    **III.    Denial of Benefits**

10        The final issue before the Court is whether, in light of its interpretation of the Plan,

11   RSL abused its discretion by finding Maurer's physical disorders alone, excluding any

12   contributing mental disorder were not sufficient to render her totally disabled.  As discussed

13   above, to qualify as "Totally Disabled" after receiving disability payments for 36 months,

14   Maurer must show she is unable to perform any of the material duties of "any occupation."

15   (See MAU00168.)  "Any occupation," in turn, is defined under the Plan as "one that the

16   Insured's education, training or experience will reasonably allow."  (Id.)  RSL determined

17   that Maurer had not met her burden of showing she is physically unable to perform all

18   material duties of the occupations of attorney, arbitrator, adjuster, investigator, consultant, or

19   claims examiner.[14]  Maurer contends RSL abused its discretion by "cherry-picking" evidence

20   _____

21        [12]  Although the Plan provides that '[a]n Insured who is Partially Disabled will be
     considered Totally Disabled" (see MAU00168), that provision applies only to the "first 36
22   months" for which benefits are payable (see id.).

23        [13]  In her reply brief Maurer states such "definition of disability flies in the face of
     decades of California law" and argues that ERISA does not preempt state laws regarding
24   insurance contract interpretation.  (Pl.'s Reply at 25.)  "While ERISA's 'savings' clause
     exempts from preemption any law of any state which regulates insurance, state laws of
25   insurance policy interpretation do not qualify for the saving[s] clause exception and are
     preempted."  See McClure, 84 F.3d at 1133 (internal quotation and citation omitted).

26        [14]  In making this determination, RSL relied on the Department of Labor's Dictionary
     of Occupational Titles ("DOT").  The DOT is "widely and routinely used to define
27   'occupations.'"  Dionida v. Reliance Standard Life Ins. Co., 50 F. Supp. 2d 934, 939 n. 4
     (N.D. Cal. 1999).  Although Maurer contends the DOT is outdated, she provides no
28   evidence suggesting the DOT's description of the duties of these occupations is no longer

1  from her medical records and not adequately crediting evidence from her treating

2  physicians.  (See Pl.'s Reply at 27.)

3       Conflicting medical testimony often arises in ERISA disputes.  See Jordan v.

4  Northrup Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) (noting

5  "conflicting reports . . . is typical of the evidence used in disability determinations").  Here, on

6  the one hand, Dr. Campagna found Maurer to be totally physically disabled.  (See

7  MAU00691.)  Conversely, Drs. Hauptman, Mahawar, Schofferman, and Birnbaum all found

8  Maurer's physical disorders alone did not render her totally disabled.  (See MAU00486,

9  MAU00783, MAU00877, MAU00981.)  Further, Dr. Hines's conclusion that Maurer's

10  "resultant emotional and social difficulties" were "not the fundamental basis of [Maurer's]

11  disability" (see MAU00885), implicitly concedes such "emotional difficulties" nevertheless

12  contribute to Maurer's disability.[15]

13       To determine whether an administrator abused its discretion in light of conflicting

14  testimony, a court must weigh several factors, including: (1) the existence of a conflict of

15  interest; (2) the "quality and quantity of the medical evidence"; (3) "whether the plan

16  administrator subjected the claimant to an in-person medical evaluation or relied instead on

17  a paper review of the claimant's existing medical records"; (4) "whether the administrator

18  provided its independent experts with all of the relevant evidence"; and (5) "whether the

19  administrator considered a contrary SSA disability determination."  See Montour, 588 F.3d

20  ────────────────

21  accurate.

22     [15] Indeed , Dr. Hine's notes are replete with references to Maurer's mental
condition, as exemplified in the following entries:

23      October 10, 2003: "Her chief complaint is ongoing depression"
24      (MAU00532);

25      November 3, 2003: "She is often late for places and feels this is part of her
    overall bad and increasing depression"  (MAU00526); and

26      September 14, 2006: "It is increasingly apparent that dynamics in the
27      relationship at home are serving to fuel the patient's difficulty in following
    through with a regular routine for her overall health emotionally and
28      physically" (MAU00865).

1   at 630 (internal quotation and citation omitted).  Courts resolving ERISA disputes, however,

2   need not "accord special deference to the opinions of treating physicians."  Black & Decker

3   Disability Plan v. Nord, 538 U.S. 822, 831 (2003).  Nor does ERISA "impose a heightened

4   burden of explanation on administrators" when their final determination is contrary to the

5   opinion of a treating physician.  Id.  A treating physician's opinion may not be "arbitrarily"

6   ignored, but it carries no special weight.  Id. at 834.

7       Having weighed the above-referenced factors, the Court finds RSL did not abuse its

8   discretion in determining Maurer was not totally disabled by reason of a physical disorder.

9   In so finding, the Court, as discussed above, has reviewed such determination applying a

10  moderate degree of skepticism.

11      First, with respect to the "quality and quantity of the medical evidence," the Court

12  finds RSL's determination was based on medical evidence of sufficient quality and quantity.

13  As noted, Drs. Hauptman, Schofferman, Mahawar, and Birnbaum, all board-certified

14  specialists in areas of practice relevant to Maurer's medical condition, considered Maurer's

15  medical record, including reported pain, medication, and physical activity,[16] and arrived, in

16  each instance, at the conclusion that Maurer was not physically totally disabled as defined in

17  the Plan.  Dr. Schofferman conducted an IME in which he thoroughly examined Maurer's

18  range of motion, reflexes, and sensitivity to pain, and found, "without the psychiatric

19  elements, [Maurer] would be capable of work activity."  (See MAU00981; see also

20  MAU00977 (discussing Maurer's vocational history as attorney).)  Consistent therewith, Dr.

21  Mahawar conducted a peer review of Maurer's file and found "[Maurer] should have been

22  capable of working in [a] sedentary occupation[,] primarily in sitting position."  (See

23

24      [16]  The record shows that at various times while on disability leave Maurer traveled,
    volunteered to lift children into Santa's lap, ice skated, swam, and regularly exercised.
25  (See, e.g., MAU00417, MAU00449, MAU00457, MAU00521, MAU00543, MAU00568,
    MAU00576, MAU00577, MAU00581, MAU00865, MAU00900).  Although the exercise
26  routine was at the suggestion of Maurer's doctor and the travel and volunteering often
    resulted in increased pain (see, e.g., MAU00387, MAU00521, MAU00577, MAU00581),
27  none of the above-listed activities is so different in nature from those she claims an inability
    to perform, specifically, an inability to "sit/stand/walk/keyboard" (see MAU01007), as to
28  render them irrelevant to RSL's determination that Maurer could perform at least one
    material duty of an occupation for which she is qualified.

1    MAU00877.)  Similarly, Dr. Birnbaum, after an IME involving flexibility and strength testing,

2    concluded: "I do not find purely physical reasons for the patient's claim of disabling pain."

3    (See MAU00783.)[17]  Moreover, even assuming some bias on the part of Dr. Hauptman

4    and/or Dr. Mahawar, there is no evidence of bias on the part of the other two physicians.

5         Further, as noted, RSL did not conduct a purely paper review of Maurer's claim.  Drs.

6    Schofferman and Birnbaum both conducted independent, "in-person medical evaluations" of

7    Maurer before determining she was physically capable of some work activity.  See Montour,

8    588 F.3d at 630.

9         Nor is there anything in the record that indicates RSL failed to provide relevant

10   evidence to any of the independent experts, and Maurer does not contend RSL failed to do

11   so.[18]

12        Next, RSL did not ignore a contrary SSA finding.  Indeed, there was no contrary

13   finding to ignore because the SSA likewise found Maurer physically capable of working.

14        Finally, contrary to Maurer's assertion, RSL did not arbitrarily ignore evidence from

15   Maurer's treating physician, nor did it rely only on "cherry-picked" evidence.  Rather, RSL's

16

17        [17]  Maurer argues that by concentrating on "physical reasons" for disability, Dr.
18   Birnbaum improperly required "objective" evidence to establish the presence or absence of
     fibromyalgia.  (See Pl.'s Reply at 12:20-21); Salaomaa v. Honda Long Term Disability Plan,
19   No. 08-55426, 2011 WL 768070, at *10 (9th Cir. Mar. 7, 2011) (finding plan's termination of
     disability claim for fibromyalgia due to lack of objective evidence of condition was abuse of
20   discretion).  According to Maurer's physician Dr. Campagna, however, Maurer was not
     disabled from fibromyalgia but, rather, was "completely disabled from psoriatic arthritis."
21   (See MAU00691.)  Maurer submits no authority that "psoriatic arthritis" is a condition for
     which objective evidence is unavailable, and, indeed, argues in her brief that the condition
22   "causes inflammation" and "swelling," both objectively measurable symptoms.  (See Pl.'s
     Mot. at 2 n.2.)  Moreover, Dr. Birnbaum agreed Maurer's pain was "consistent with the
23   previous diagnosis of fibromyalgia," and did not criticize that diagnosis.  (See MAU00782.)
     When read in context, Dr. Birnbaum's reference to "physical reasons" is not a reference to
24   objectively measurable symptoms, but to a condition not caused by or contributed to by a
     mental or nervous disorder.

25        [18]  Although Dr. Schofferman noted that the medical records provided for his review
26   were "incomplete" in that it did not contain "anatomical data in the form of x-rays or MRI
     scans of the neck and low back which are the dominant residual pain generators
27   historically" (see MAU00979), Maurer does not argue that RSL possessed such records
     and failed to provide them to Dr. Schofferman.  Indeed, the only x-rays and MRI scans
28   referenced by the parties were taken after October 26, 2005, the date on which Dr.
     Schofferman submitted his report.  (See MAU0701; MAU00836; MAU00892; MAU00974.)

18

1   reliance on Dr. Hines's diagnoses of "Pain Disorder with Mixed Physical and Psychological

2   features," "Mood Disorder with General Medical Condition," and "Generalized Anxiety

3   Disorder" (see MAU00634) was reasonable.[19]  Dr. Hines's opinion in that regard was

4   consistent with the opinions of Drs. Hauptman, Schofferman, and Birnbaum (see

5   MAU00487, MAU00782, MAU00981), and was supported by findings reflected in his records

6   (see, e.g., MAU00526, MAU00532, MAU00552, MAU00865).  As discussed above, under a

7   reasonable interpretation of the Mental/Nervous Limitation, RSL properly excluded these

8   psychiatric components of Maurer's disability in determining Maurer's eligibility for continued

9   benefits.

10        Although RSL did not accept Dr. Hines's opinion in full, its reasons for not doing so

11  were made clear in its letter to Maurer.  In particular, RSL concluded that the opinions of

12  Drs. Schofferman, Hauptman, Mahawar, and Birnbaum were more credible than the

13  opinions of Drs. Hines and Campagna because Dr. Hines's "opinion concerning [Maurer's]

14  'physical limitations and difficulties' [was] not supported by the results of actual objective

15  studies and examination findings" (see MAU00663 (citing Dr. Birnbaum's conclusion)) and

16  "the consensus of the independent physicians is that in the absence of [Maurer's] significant

17  psychiatric component, [Maurer's] physical status would not preclude work function"

18  (see MAU00667); see also Jordan, 370 F.3d at 880 (holding "reasonable people can

19  disagree on whether [plaintiff] was 'disabled' for purposes of the ERISA plan[;] [b]ecause

20  that is so, the administrator cannot be characterized as acting arbitrarily in taking the view

21  that [plaintiff] was not").  Such determinations, i.e., reasoned determinations based on the

22  opinions of doctors who disagree with a treating physician, do not constitute inappropriate

23  cherry-picking.  See Black & Decker, 538 U.S. at 831, 834 (holding treating physician's

24

25        [19] Maurer argues the above-described diagnoses was contained in an "office note
26  prepared by a nurse practitioner."  (See Pl.'s Reply at 7 n.3.)  Although the note is signed
    by "Lisa Elvin, RN, NP," and not by Dr. Hines (see MAU00635), such record also states
27  Elvin was "Medically Supervised" by Dr. Hines (see id.).  Maurer fails to show why RSL
    could not reasonably rely on such record as an accurate statement of Dr. Hine's diagnoses,
28  particularly where Dr. Hines did not disavow such diagnoses in his November 30, 2006
    letter in support of Maurer's objection to RSL's denial of benefits.

1   opinion may not be ignored "arbitrarily," but is not entitled to "special deference").

2

3                                **CONCLUSION**

4        For the foregoing reasons, the Court finds RSL's termination of Maurer's benefits was

5   not an abuse of discretion.

6        Accordingly, RSL's Cross-Motion for Judgment is GRANTED and Maurer's Motion for

7   Judgment is hereby DENIED.

8        **IT IS SO ORDERED.**

9

10  Dated: March 31, 2011

11                                         MAXINE M. CHESNEY
                                           United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28